This case was originally heard before Deputy Commissioner Dillard in Rockingham, NC, on 17 May 1994. After the hearing the parties took the depositions of Drs. Stephen J. Naso, Jr. and Ward Oakley, Jr.
* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dillard and the briefs and arguments on appeal. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the holding of the Opinion and Award. Pursuant to its authority, however, the Full Commission has modified the Opinion and Award, as follows.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed at all times relevant to this claim.
3. Constitution State Service Company is the compensation carrier or self-adjusting agency on the risk.
4. The parties entered into a Pre-trial Agreement and that document is incorporated into the record.
* * * * * * * * * * * * *
The Full Commission adopts the Findings of Fact found by the Deputy Commissioner, and finds as follows:
FINDINGS OF FACT
1. At the time of the initial hearing before the Deputy Commissioner, plaintiff was 29 years old. Defendant-employer hired plaintiff sometime in 1989 to work in the mail order packaging department.
2. At the time of the original hearing a resident of Rockingham, plaintiff graduated from high school, and for two years studied word processing at Michigan Christian College, with no further schooling, training, or certification beyond that, except for the training she received in the U.S. Army. In the Army the plaintiff worked as a telecommunications operator which involved some typing. Plaintiff received an honorable discharge in 1987 after three years.
3. Her only jobs before joining defendant-employer were with the U.S. Army, described above, Commonwealth Hosiery and the Richmond County School System. Plaintiff worked for two or three weeks with Commonwealth Hosiery in Richmond County. There she sewed lace onto socks. Next, plaintiff worked for the Richmond County Schools as a secretary where she remained one year before moving to go to work for defendant-employer.
4. Plaintiff's job for in mail order packaging required her to check panty hose (or stockings) manufactured by defendant employer, after crates of the product were brought to her by the material handler. Approximately 300 to 400 dozen pairs of the product filled one crate or box and plaintiff would check the stockings to make sure that she had the right style and size. Plaintiff also took a hot plate and placed it on the back of her machine which put printing on each bag of stockings after they were packed. After she transferred an appropriate number of stockings to her table (the number varied according to the style of product), she would pick up a pair of stockings with her left hand and use her right hand to twist the nylons into a ball. Then she put the stockings into the funnel with her hand and packed the bag. Immediately after she packed a particular bag, she would hit two knobs with both hands which automatically sealed the bag and then would force down another bag when the sealed one was done.
5. Later, plaintiff was transferred to the promotions (or line picker) position for defendant-employer. In that job she would join other employees on an assembly line. The person at the head of the line puts the cardboard display model onto the line and each person would place her assigned product into the display. Plaintiff would specifically pick up cartons and put them into the display. The task involved her arms, elbows, and hands.
6. Before development of her occupational disease, plaintiff worked for defendant-employer in her job as a Mail Order Packager for more than (8) hours per day, 5-6 days per week, and earned over the production rate. Plaintiff earned between $7.50 and $9.00 per hour in that position.
7. Until approximately December 1991 plaintiff worked in mail order packaging. In that position she had to meet a minimum production level which she always did. Further, as her production grew and she worked faster her earnings increased. Plaintiff recalls that within an hour she could complete at least four boxes of stockings, each box containing (20) dozen pairs. Plaintiff recalled completing up to (600) dozen per day, but that varied according to the type of work.
8. In December 1991 plaintiff developed soreness in her arms which stretched from below each elbow to the wrist, essentially afflicting her forearms, which grew worse over time. The pain kept her from doing an adequate job, but she continued to attempt to work.
9. Plaintiff reported her complaints and symptoms to her supervisor, Gracie Ingram, in early March 1992 who then referred her to the plant nurse, Martha Carter, now deceased. Nurse Carter offered several remedies but never referred or recommended that plaintiff consider workers' compensation. When plaintiff showed interest in changing jobs in light of her difficulties; Nurse Carter said her that she would have to apply for another position in order to get it. In the interim, plaintiff wore make-shift gloves to lessen her pain, which she identified at the hearing and continued to wear throughout the period she worked in mail order packaging. By the time of her transfer, Dr. Howell had prescribed a set of braces for her arms and hands which had been specially designed for carpal tunnel and which relieve her soreness and pain so long as she wears them.
10. In early 1992 plaintiff informed Audrey Campbell, safety adviser for defendant-employer, of her homemade gloves.
11. Plaintiff applied for two other jobs working for defendant-employer, both of which she felt would be easier on her upper extremities. She applied for the promotions job and was accepted in late March 1992. When plaintiff transferred to promotions her wages dropped to a low of $7.06 per hour although she continued to work 40 hours and 5-6 days per week. Plaintiff continues to work with defendant-employer and at the time of the initial hearing before the Deputy Commissioner she earned $7.35 per hour. At the time she applied for the new position, plaintiff had also scheduled an appointment with Dr. Howell for April 1992 but when her hand problem lessened she canceled the appointment. When her problems increased less than two months later, she scheduled another appointment with Dr. Howell and saw him June 2, 1992. Plaintiff chose Dr. Howell because no one with defendant-employer had referred her to a doctor and because Dr. Howell was accepted by her health insurance plan. Later, Dr. Howell referred her to Drs. Glen Subin of Pinehurst, North Carolina; Ward Oakley, Jr., of Rockingham; and Stephen J. Naso of Charlotte.
12. Throughout this period plaintiff never missed any work due to her complaints except for those times she had to attend medical appointments with the above doctors.
13. The new position to which plaintiff transferred in March of 1992 was still fast but less strenuous than the mail order packager job which involved more heavy production work.
14. Plaintiff often skipped work breaks in her former position in the mail room so that she could keep working and increase her take home pay. Plaintiff sought the transfer because of her physical difficulties and not because of any desire to get a first shift job.
15. Defendants presented a video of someone performing both of the positions plaintiff had held. However, plaintiff testified that the video of the mail order packager tasks were accurate but performed much slower than she performed them herself. She had the same critique of the video's presentation of the job to which she had transferred. At the time she received treatment from Dr. Naso he was unsure whether he had actually seen the video.
16. During this period, plaintiff received a letter from her health insurance carrier having earlier been advised by Howell to leave the form blank where she was asked to state the cause of her problems, lest her health insurance carrier refuse to pay if she wrote an occupational cause. Further, in plaintiff's presence Dr. Howell telephoned plant nurse Martha Carter, who informed both plaintiff and Dr. Howell that it was okay for her to see the doctor.
17. At the time of the hearing, plaintiff testified that one arm is no better than the other; she commented on her soreness and pain in the elbows, hands, and fingers. Plaintiff has had no prior workers' compensation claims.
18. Plaintiff testified about the meetings with Nurse Carter that appeared in Ms. Carter's notes. The March 10, 1992 note indicated her arm and hand problems began before Christmas 1991 and the pain immediately before March 10. The next note, dated March 20, 1992, reported that plaintiff's March or April 1992 appointment with Dr. Howell was canceled because she was feeling better and in that same note Martha Carter wrote that plaintiff felt that the pain was coming from her job. Plaintiff elaborated on the third note, dated June 10, 1992, wherein it reported that she described her visit to Dr. Howell to Martha Carter. Plaintiff, after being presented several employment records, refreshed her recollection and stated that she began her job in promotions either March 30, 1992 or April 1, 1992. when she was asked why one of her employment medical forms of March 1992 indicated that she had no problems with her upper extremities, she reconciled it by explaining the comment appearing on the same form which stated "Present bilateral hand and elbow pain."
19. Aside from any confusion as to exactly when she transferred jobs, the Full Commission finds plaintiff's testimony to be credible. Furthermore, plaintiff testified that was sure that she spoke with plant nurse Martha Carter three (3) times about her problems before seeing Dr. Howell. Plaintiff probably spoke with supervisor Gracie Ingram about her problems in February 1992 and also spoke with Audrey Campbell about them at some point during this period.
20. Gracie Ingram, plaintiff's supervisor in mail order packaging had served with defendant-employer for twenty-seven (27) years with her duties in 1993 including keeping up with employees, their safety, etc. Ms. Ingram testified that she knew of plaintiff's problems prior to her transfer. Ms. Ingram felt that for the most part plaintiff's description of the job was accurate and that although workers on plaintiff's shift would probably hit the knobs similarly, each worker might roll the stockings in different manners. Ms. Ingram verified that the mail order job would induce employees to work at a swift pace in order that their take home pay would increase and confirmed that plaintiff skipped breaks and, accordingly, raised her efficiency level. As for whose decision it should be to refer someone to workers' compensation, Ms. Ingram said that it was the responsibility of the safety officer (Audrey Campbell) or the plant nurse (Martha Carter).
21. Ms. Manna Moss, employed by defendant-employer as supervisor in the promotions department emphasized that although it depicted the way in which plaintiff did her job, different displays would require different paces and that the video was an example of someone working at an "average pace." She confirmed plaintiff's wage in promotions as $7.37 per hour and that she knew about plaintiff wearing arm braces at work for quite a while and admitted to loaning plaintiff a set of braces because plaintiff had left her own at home.
22. Plaintiff testified that at times she was forced to work overtime in her employment with defendant-employer. Further, plaintiff stated that any statements to the effect that she had only requested a transfer to get to first shift were untrue. Plaintiff also said that Ms. Ingram's comments that the video showed a worker working faster than plaintiff at the same jobs was untrue and that she hit the knobs with the palm of her hand, not her wrists, describing the pressure applied requiring medium force.
23. Dr. Stephen J. Naso, Jr. is an Orthopedic surgeon with a subspecialty in hand surgery who has practiced medicine for (27) years. Plaintiff was referred to Dr. Naso by defendants and was examined by him on April 25, 1994. At that time plaintiff made the complaints of soreness and numbness in her upper extremities. Dr. Naso performed tests on plaintiff to determine whether she had carpal tunnel syndrome and was of the opinion that the tests came out negative. On cross-examination, Dr. Naso said that the negative carpal tunnel findings did not necessarily rule out plaintiff's symptoms or trouble. In fact, he believed plaintiff's complaints of pain and that they were primarily muscular in origin.
24. Dr. Naso opined that plaintiff could do the promotions (or line picking) job without major difficulty and noted that some of his findings might suggest symptom magnification, but he did not further address that issue or make a finding regarding symptom magnification. However, Dr. Naso did believe that the mail order packaging job was more repetitive than the promotions job and would be more problematic for plaintiff and still recommended the use of hand splints/braces in her new position.
25. Dr. Naso, after reviewing the video of plaintiff's former position, opined that to a reasonable degree of medical certainty the mail order packing job caused or significantly contributed to her carpal tunnel syndrome and her overall problems, muscle aches and pain.
26. Dr. Naso further opined to a reasonable degree of medical certainty that plaintiff's former position in the mail order packing job placed plaintiff at an increased risk of developing her stated problems.
27. Dr. Ward Oakley, Jr. is board certified, has practiced medicine in North Carolina for approximately 11 years, and is an orthopedic surgeon. He and Dr. Egar Howell, are partners.
28. Dr. Howell's notes indicate that plaintiff reported doing rapid, repetitive movement and was of the opinion that plaintiff had carpal tunnel syndrome.
29. Dr. Oakley first examined plaintiff on June 10, 1992 and again on June 18, 1992, August 24, 1993 and August 31, 1993. During those times plaintiff made the complaints of soreness, pain and numbness in her upper extremities, namely in her arms and elbows. Dr. Oakley testified that it was his opinion that plaintiff had chronic tendinitis of the upper extremities. He explained that his diagnosis is essentially a term for pain usually involving the tendons and muscle structure of the forearm and hand.
30. Dr. Oakley reviewed had been informed by plaintiff and Dr. Howell's notes of the repetitive nature of plaintiff's job. He also had toured defendant-employer's plant and observed the types of jobs plaintiff had performed and observed for himself that this type of production work involved repetitive use of the hands and wrists. From these sources Dr. Oakley opined that plaintiff, at the time her problems began did production line work involving hitting the palm of her hand to seal bags, from which the pain developed in the palm of her hands. To a reasonable degree of medical certainty Dr. Oakley opined that plaintiff's job played a significant role in plaintiff's development of her upper extremity problems.
31. Dr. Oakley reported that it was his opinion that plaintiff has a five percent (5%) permanent partial impairment of the hand and upper extremities based upon her persistent pain and discomfort of the chronic tendonitis. He recommended that she would continue wearing her braces, take anti-inflammatory medicines, etc.
32. Dr. Oakley also disagreed with defendants' contention about the commonality of developing tendonitis and said it was his opinion that tendonitis in the hands and wrists come from repetitive motion jobs. Dr. Oakley, when asked what percentage of the North Carolina work force is at risk for developing plaintiff's symptoms, opined that such incidents are more likely for patients who work in textile mills or do repetitive activities.
33. Dr. Oakley testified that he is familiar with occupational or industrial disease, treating two or three cases per day. Perhaps twenty percent of his medical practice concerns the hands and upper extremities. He also stressed that he was certain of his opinions.
34. The testimony of Gracie Ingram that plaintiff worked slower than the person depicted on the videotape is inconsistent with other credible evidence. Furthermore, witness Gracie Ingram and witness Manna Moss contradicted each other on the manner of work plaintiff did for defendant-employer. The defendants had adequate and timely notice of plaintiff's injury.
35. Documents throughout the record indicate that according to plaintiff's initial recollection her injury occurred on or about 10 July 1992. However, based on its review of the entire record the Full Commission finds, for the purposes of awarding temporary partial disability compensation, that the date plaintiff's disability began was sometime in late March 1992.
36. A Pre-Trial Agreement was submitted on 17 May 1994 which provided for the submission of an Form 22 wage chart. On 21 November 1995 a Form 22 wage chart was received by the Full Commission. Plaintiff's average weekly wage at the time her disability began was $397.18.
37. As the result of her compensable occupational disease, plaintiff was temporarily partially disabled from the date she transferred to the Promotions job through the date of this Opinion and Award.
* * * * * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-53 identifies (27) occupational diseases deemed compensable for workers' compensation purposes. To be compensable as an occupational disease, a disease other than those specifically enumerated in § 97-53 must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside the employment.
2. Based upon the greater weight of the competent evidence of record, plaintiff's former position as a mail order packager with defendant-employer caused or significantly contributed to her development of chronic tendonitis of the upper extremities and/or similar repetitive motion occupational diseases. N.C. Gen. Stat. § 97-53.
3. Based upon the greater weight of the credible evidence of record, plaintiff's former position as a mail order packager with defendant-employer exposed her to an increased risk of developing chronic tendonitis of the upper extremities and/or similar repetitive motion occupational diseases. Id.
4. Plaintiff's average weekly wage on the date her disability began in March 1992, and for the purposes of determining temporary partial disability compensation, was $397.18. G.S. § 97-2(5).
5. As the result of the plaintiff's compensable occupational disease she is entitled to be paid by defendants temporary partial disability compensation at the rate of two-thirds of the difference between her average weekly wage at the time her disability began and her average weekly wage on the date she transferred to the promotions job in March of 1992 so long as she remains so disabled but not to exceed a period of three hundred (300) weeks from the date her disability began. N.C. Gen. Stat. § 97-30.
6. Counsel for plaintiff is entitled to a fee of twenty-five (25%) percent of the compensation to which plaintiff is entitled to pursuant to this Opinion and Award.
7. As the result of her compensable occupational disease, plaintiff is entitled to have defendants pay for all reasonable medical expenses incurred or to be incurred. N.C. Gen. Stat. §97-25.
* * * * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law the Full Commission affirms in part and modifies the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay temporary partial disability benefits to plaintiff at the rate of two-thirds of the difference between her average weekly wage when her disability began ($397.18) and her average weekly wage on the date she transferred to the promotions job in March of 1992 so long as she remains so disabled but not to exceed a period of three hundred (300) weeks from the date her disability began. That amount having already accrued shall be paid to plaintiff in a lump sum. This amount is subject to the fee approved herein for counsel for plaintiff.
2. The defendants shall pay all medical-related expenses related to plaintiff's disability which have been incurred or will be incurred by plaintiff for the necessary and reasonable treatment of her injury, when bills for the same have been submitted to defendants and approved pursuant to procedures established by the Industrial Commission.
3. Plaintiff's counsel shall receive a fee for his services in the amount of 25% of the award payable to plaintiff. Such amount as has already accrued shall be paid to counsel for plaintiff in a lump sum with counsel for plaintiff receiving every fourth check payable to plaintiff under the above Award thereafter.
4. Defendants shall pay the costs.
 S/ _______________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _____________________ LAURA K. MAVRETIC COMMISSIONER
S/ _____________________ WILLIAM L. HAIGH CHIEF DEPUTY COMMISSIONER